IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-488

No. COA19-866

Filed 21 September 2021

Mecklenburg County, No. 15CVD4500

NICOLE J. BLANCHARD, Plaintiff,

v.

DAVID M. BLANCHARD, Defendant.

Appeal by Defendant from order entered 2 April 2019 by Judge Paige B. McThenia in District Court, Mecklenburg County. Heard in the Court of Appeals 9 June 2020.

*James, McElroy & Diehl, P.A., by Preston O. Odom, III, Jonathan D. Feit and Haley E. White, for plaintiff-appellee.*

*Collins Family Law Group, by Rebecca K. Watts, for defendant-appellant.*

STROUD, Chief Judge.

Defendant-Father appeals from the trial court's order (the "Contempt Order") holding him in civil contempt of provisions of a consent order regarding custody of the children (the "Custody Order") involving communication between the children and Plaintiff-Mother when the children were in his care. On appeal Father has raised a constitutional due process argument claiming he did not have sufficient notice as to whether Mother sought to hold him in civil or criminal contempt as to specific allegations of violations of the Custody Order. We need not address this argument

because prior to hearing, Mother elected to proceed only as to civil contempt on two specific allegations, and the trial court heard and ruled on only these allegations. Father also contends the trial court erred by holding him in civil contempt and that the purge conditions were improper. Because the trial court's findings of fact support its conclusions of law, the trial court did not err by holding Father in civil contempt. Because the trial court set forth clear and specific purge conditions, and these conditions are not modifications of the Custody Order, we affirm the trial court's order. This opinion is filed contemporaneously with Father's appeal of the trial court's order awarding Mother attorney's fees, COA20-165. The attorney's fees order was entered after Father's appeal of the Custody Order.

## I. Factual and Procedural Background

¶ 2        Mother and Father were married in 2007, had three children, and separated on 2 March 2015. Mother filed the complaint including a claim for custody on 6 March 2015. The Custody Order was entered on 6 November 2015 and granted primary physical custody of the children to Mother and regular specific visitation to Father. The "General Provisions Governing Custody" section of the Custody Order also included a provision regarding daily telephone and FaceTime contact between the children and each parent when the children are with the other parent (the "FaceTime Provision"). Under the FaceTime Provision, "[e]ach party shall generally have unrestricted but reasonable telephone contact with the minor children. The parties

agree to make the minor children available to the non-custodial parent for phone or FaceTime contact for fifteen minutes each evening."

¶ 3     Mother alleged that Father had been violating the FaceTime Provision in the Custody Order, and she filed a "Motion for Contempt" (the "Contempt Motion") on 3 January 2019, in which she moved the trial court to "[i]ssue a Show Cause Order, directing that a hearing be conducted . . . and, at such hearing, order Father to show cause as to why [he] should not be held in contempt for his violations of the Custody Order." The Contempt Motion requested the trial court find Father in civil contempt, force Father's compliance with the terms of the FaceTime Provision, and find him in criminal contempt, "as a result of his willful failure to comply with the provisions of the Custody Order as set forth" in the Contempt Motion. Mother also requested the trial court order "a reasonable attorney's fee for all time and costs expended . . . in connection with the preparation, filing, and prosecution of" the Contempt Motion "and make such payment a purging condition of Father's contempt[.]" Mother requested that the trial court "order Father to show cause as to why [he] should not be held in contempt for his violations of the Custody [O]rder[.]"

¶ 4     The trial court entered an Order to Show Cause (the "Show Cause Order") on 10 January 2019, in which it found "probable cause to believe that a civil and/or criminal contempt [by Father] has occurred, and a hearing should be conducted on the[] allegations" contained in Mother's Contempt Motion. (Emphasis removed.)

Father was ordered to appear before the trial court on 12 February 2019 "and show cause, if any, as to why [he] should not be held in contempt." Father filed a Motion to Dismiss and in the Alternative Motion for More Definite Statement (the "Motion to Dismiss") on 1 February 2019, in which Father requested that the trial court either "dismiss with prejudice [the Contempt Motion] . . . on the basis of N.C.R.C.P. 12(b)(6), N.C.G.S. 5A-23(g), and/or violation of [Father's] constitutionally protected right to due process of law pursuant to the 5th and 14th Amendments" or, in the alternative, to grant Father's "Motion for a More Definite Statement[.]" In Father's motion, he argued that Mother had "failed to state a claim upon which relief can be granted"— contending that because "[a] person who is found in civil contempt under [] Article [2, Chapter 5A] shall not, for the same conduct, be found in criminal contempt under Article 1 of this Chapter[,]" N.C. Gen. Stat. § 5A-23(g) (2019), it was impossible for him to know whether Mother's motion to show cause, which included claims of both civil and criminal contempt—based upon the same evidence—would result in a civil contempt hearing or a criminal contempt hearing. Father's requests were based on his argument that Mother had not specifically stated in the Contempt Motion the alleged violations of the Custody Order that would be pursued as civil contempt and those that would be prosecuted as criminal contempt. Father contended that Mother "not providing clear notice in the [Contempt Motion] nor the . . . Show Cause [Order] prevents Father from having clear notice as to which form of contempt is sought and

makes Father susceptible to gross errors in the proceedings and his defenses in such proceedings; this violates Father's right to due process." Father filed a Motion to Continue (the "Motion to Continue") one week later, arguing that he should be given time to argue the Motion to Dismiss before the hearing on the Contempt Motion. Father's motions were heard and denied on 12 February 2019, just prior to commencement of the contempt hearing.

¶ 5 Father's Motion to Continue was formally denied by order entered 15 February 2019, and the trial court's denial of the Motion to Dismiss was formally denied within the trial court's 2 April 2019 Order (Re: Civil Contempt) (the "Contempt Order"). In the Contempt Order, the trial court found Father to be in violation of the Custody Order. The issue of attorney's fees was reserved to be heard at a later date. Father appealed.

## II.    Interlocutory Appeal

¶ 6 The Contempt Order on appeal is an interlocutory order as it does not resolve all pending claims. The appeal of a contempt order affects a substantial right and is immediately appealable. *See Guerrier v. Guerrier*, 155 N.C. App. 154, 158, 574 S.E.2d 69, 71 (2002) ("The appeal of any contempt order, however, affects a substantial right and is therefore immediately appealable. *Willis v. Power Co.*, 291 N.C. 19, 30, 229 S.E.2d 191, 198 (1976); *see Turner v. Norfolk S. Corp.*, 137 N.C. App. 138, 141, 526 S.E.2d 666, 669 (2000)").

## III. Analysis

### A. Standards of Review

> The standard of review of orders from contempt proceedings is limited to determining whether competent evidence supports the findings of fact and whether those findings support the conclusions of law. *Sharpe v. Nobles*, 127 N.C. App. 705, 709, 493 S.E.2d 288, 291 (1997). Where the admitted evidence supports the trial court's findings, those findings are binding on appeal "even if the weight of the evidence might sustain findings to the contrary." *Hancock v. Hancock*, 122 N.C. App. 518, 527, 471 S.E.2d 415, 420 (1996). "[T]he credibility of the witnesses is within the trial court's purview." *Scott v. Scott*, 157 N.C. App. 382, 392, 579 S.E.2d 431, 438 (2003).

*Wilson v. Guinyard*, 254 N.C. App. 229, 235, 801 S.E.2d 700, 705 (2017).

We also review *de novo* the trial court's "apprehension of the law" to determine if the trial court considered the issues under the correct legal standards. *See generally id.* So long as the trial court applied the correct law in its analysis and ruling, we conduct the regular *de novo* review to determine if the trial court's legal conclusions are supported by its findings of fact. *Id.*

### B. Due Process Requirements

In Father's first argument, he contends that "[t]he trial court violated [his] due process rights by denying his request to be notified of the nature of the contempt charges prior to the beginning of the [contempt] hearing." We disagree.

Father argues that "the trial court violated [Father's] due process rights by denying his request to be notified of" the "criminal or civil nature of the allegations"

of "the contempt charges prior to the beginning of the hearing." (Capitalization altered.) The sole allegation in Father's argument is that the notice given to him failed to inform him whether each of Mother's seven allegations of Father's violation of the Custody Order would be pursued for civil contempt or would be prosecuted for criminal contempt; and that this alleged failure to provide Father proper notice violated his due process rights as guaranteed by the Constitution of the United States.

¶ 10       On 12 February 2019, just prior to the contempt hearing, Father argued that his motions to dismiss should be considered and decided before the contempt hearing and requested a continuance of the contempt hearing. Mother's attorney informed the trial court that "we'll probably have to bifurcate since there are some issues related to criminal and some issues related to civil [contempt,]" and Mother's attorney estimated the hearing would take "an hour." The trial court responded: "I think we can't do anything over twenty minutes." Mother's attorney suggested "that we . . . pursue the civil contempt issue within the twenty minute rule, and if we don't have time to hear the criminal we can find another date[.]"

¶ 11       Father's attorney responded: "We were just told ten minutes ago . . . whether those [allegations] are civil or criminal." Father's attorney explained: "So there's not [] sufficient notice, and Father is entitled to time to prepare an appropriate defense and address the matters specifically as criminal or specifically as civil[,]" because

the procedures for a civil trial and procedures for a criminal trial are very different, and the constitutional safeguards are very different. So it is Father's fundamental constitutional right . . . to not to have yourself incriminated and right to not testify against yourself and the due process clause of the 14th Amendment as to know what procedures you're going to go forward with before you get there.

¶ 12　More specifically, Father argued that Mother failed to state a claim "as she did not clearly state whether she [was] seeking to hold Father in civil contempt or criminal contempt for each individual allegation made" against Father. Father further alleged this lack of a more specific notice violated his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States. Father stated: "For civil contempt, the [trial court] follows civil procedure[,]" whereas "[f]or criminal contempt, the [trial court] follows criminal procedure." Father contended that because "[a] person cannot be held in both civil and criminal contempt[,]" he had "a right to know which type of contempt [was] sought before the hearing so that his defense [could] be properly made."

¶ 13　The trial court asked Father: "But you've [been informed of] all of the *allegations*, correct?" (Emphasis added.) Father confirmed that he did, but again argued that Mother's motion did "not specify whether they are civil contempt *allegations* or criminal contempt *allegations*." (Emphasis added.)

¶ 14　The trial court denied Father's Motion for Continuance by order entered 15 February 2019. In the Contempt Order the trial court "denied . . . Father's Motion to

Dismiss and Motion for More Definite Statement[,]" stating:

> After considering the arguments of counsel and the relevant case law presented, the [trial court] concluded that [Mother] was not required to elect civil or criminal contempt as to each alleged violation within a specified period of time prior to the contempt hearing; it is sufficient that the Order to Show Cause gave notice to [Father] that there was probable cause to believe a civil and/or criminal contempt had occurred based on the allegations in [Mother]'s Motion for Contempt.

¶ 15    Mother contends Father "failed to preserve his due process challenge for appellate review." Mother notes that Father did not file a notice of appeal from either the trial court's Order to Show Cause or the order denying his Motion to Continue, and argues that because he did not appeal from these orders, Father failed to preserve this issue for review. Mother also argues that prior cases have not required the moving party to elect either civil or criminal contempt before the hearing.

¶ 16    Both parties have made extensive arguments on the due process issue, but based upon the record before us, we need not address this issue because Father had proper notice of the alleged contemptuous actions, and the trial court only considered civil contempt at this hearing. Father argues Mother should have been required to elect before the hearing whether to pursue civil or criminal contempt, and although we do not address whether Mother was *required* by law to make this election, she *did* in fact inform Father, prior to the hearing, which allegations would form the basis of her action for civil contempt.

¶ 17        At the start of the hearing, due to the time constraints on the trial court, Mother elected to "pursue the civil contempt issue within the twenty-minute rule, and if we don't have time to hear the criminal we can find another date." In addition, the civil contempt hearing was limited to allegations contained in "paragraphs 5 and 6 [of Mother's] Motion for Contempt[.]"[1] The trial court held Father in civil contempt based solely on his violations of the allegations of paragraphs 5 and 6 of the Contempt Motion—specifically, the trial court found that Father violated the provision in the Custody Order requiring each party to provide "Unrestricted Telephone Contact" by making "the minor children available to the non-custodial parent for phone or FaceTime contact for fifteen minutes each evening." The Contempt Order is the only order before this Court on appeal.

¶ 18        Mother's Contempt Motion and the Show Cause Order gave Father detailed notice of the factual allegations regarding his failure to allow phone or FaceTime access prior to the hearing, and the trial court only heard Mother's claim of civil contempt regarding the allegations in paragraphs 5 and 6 of the Contempt Motion. Although the Contempt Motion did present other allegations of violations of the Custody Order, and in it Mother requested criminal contempt, the trial court did not address those issues at the contempt hearing or in the Contempt Order. Father's

---

[1] The Contempt Motion included other alleged violations of the Custody Order in paragraphs 3,4,7, and 8. These allegations were not addressed at the hearing or in the Contempt Order.

arguments ask this Court to speculate about issues which may have arisen *if* the trial court had denied his Motion to Continue and his Motion to Dismiss and *then* held a hearing *on both civil and criminal contempt* on *all the allegations* in Mother's Contempt Motion. However, the hearing was "bifurcated," and the trial court considered *only* civil contempt based on the two specifically identified allegations. We will address on appeal only the arguments based on the issues presented and decided at the hearing and included in the trial court's order. *Shell Island Homeowners Ass'n, Inc. v. Tomlinson*, 134 N.C. App. 286, 291, 517 S.E.2d 401, 404–05 (1999) ("Courts have no jurisdiction to determine matters that are speculative, abstract, or moot, and they may not enter anticipatory judgments, or provide for contingencies which may arise thereafter."). Our review is limited to the proceedings that actually occurred, are relevant to the trial court's findings, conclusions, and rulings resulting in the Contempt Order, and the Contempt Order itself. We dismiss Father's due process arguments.

**C. Compliance at Time of the Hearing**

¶ 19    In his second argument, Father contends "the trial court erred in holding [him] in civil contempt when he was in compliance at the time of the hearing." Father argues that "trial court's own findings of fact show that [Father] was in compliance with the FaceTime access provisions of the custody order at the time of the hearing so he could not have been held in contempt." Father contends that since Finding of

Fact 17 states that he had turned on the iPad from 6:00 p.m. to 6:30 p.m., he had complied with the Custody Order, stating "the trial court erred in holding [him] in civil contempt when he was in compliance at the time of the hearing." We disagree.

¶ 20    The trial court found these facts relevant to Father's argument:

> 4. The Custody Order provides, among other things, as follows:
>
> > C(g). Unrestricted Telephone Contact. Each party shall generally have *unrestricted but reasonable* telephone contact with the minor children. The parties agree to *make the minor children* available to the non-custodial parent for *phone* <u>or</u> *FaceTime* contact for fifteen minutes each evening.
>
> . . . .
>
> 12. Since the entry of the Custody Order, [Father] has willfully violated the terms of the Custody Order by *willfully failing to provide [Mother] with FaceTime access* to the minor children during his periods of custodial time.
>
> 13. On April 28, 2018, three (3) days after getting remarried, [Father] emailed [Mother] informing her that he set up the minor children's iPad for FaceTime so that [Mother] could FaceTime the minor children directly, and that he would ensure that the iPad was turned on and charged. Prior to this, [Mother] sent and received FaceTime calls with the minor children through [Father]'s phone.
>
> 14. On April 29, 2018, [Father] *blocked [Mother]'s phone number from his cell phone.* As a result, email was [Mother]'s only means of communication with [Father], and the only way she could request FaceTime calls with the minor children when her calls to the minor children's iPad went unanswered. Since that time, *[Father] has*

*continuously ignored [Mother]'s repeated requests to FaceTime the minor children* during [Father]'s custodial time, despite [Mother] informing [Father] that her calls to the minor children's iPad had gone [un]answered.

15. From April 30, 2018 through September 2018, *[Mother] called the minor children's iPad at least sixty four (64) times*, but *none* of her calls were answered.  During this time, *[Father] only allowed [Mother] FaceTime access to the minor children on three (3) occasions.*

16. *Beginning* in or *around September 2018*, [Mother] could *no longer FaceTime the minor children's iPad* from her phone *because the children's iPad was either turned off, not connected to WiFi, or FaceTime was disabled.*

17. [Father] *arbitrarily chose* to turn the minor children's iPad on each evening from 6:00 p.m. to 6:30 p.m. *without informing [Mother]* that she should call during that thirty (30) minute time period.  From May 2018 *through the hearing of this Motion*, [Mother] sent numerous text messages and emails to [Father] asking to FaceTime the minor children.  *[Father] did not respond to any of [Mother]'s FaceTime requests.*

18. On one occasion, after [Mother] requested a FaceTime call with the minor children, [Father] sent her a copy of his marriage license.  [Father] saved [Mother]'s contact information in his phone as "Psycho Bitch."  *This conduct evidences the willful nature* of [Father]'s failure to allow [Mother] FaceTime access to the minor children.

19. [Mother]'s counsel wrote [Father]'s counsel on *seven (7) occasions* [between 25 June 2018 and 2 November 2018] *regarding [Father]'s refusal to allow [Mother] to FaceTime* the minor children.  Despite [Mother]'s counsel's efforts, *[Father] continued to deny [Mother] FaceTime access to the minor children.*

(Emphasis added.)

¶ 21    Father does not challenge the findings of fact as unsupported by the evidence but argues that the findings demonstrate that because he had the children's iPad on each evening from 6:00 p.m. to 6:30 p.m., he complied with the terms of the Custody Order. Father's argument takes a portion of finding 17 out of context in order to argue it was made in error, asserting the "[b]ecause the [trial] court specifically found that [Father] was providing access between 6 p.m. and 6:30 p.m., finding 12 that [Father] has failed to provide access must be interpreted as" a finding that Father was in compliance with the FaceTime Provision at the time of the contempt hearing. The full sentence in finding 17 reads: "Father arbitrarily chose to turn the minor children's iPad on each evening from 6:00 p.m. to 6:30 p.m. *without informing [Mother] that she should call during that thirty (30) minute time period.*" (Emphasis added.) Without citation to the transcript, Father also argues that "[t]he uncontroverted testimony was that a week or two before trial, Father made Mother aware of the accessibility window, and that Father had had the children available during that time." But it is the trial court that determines the credibility and weight of the evidence and, here, the trial court found Mother's evidence of Father's refusal to respond to her many requests regarding her inability to contact the children more credible than Father's contentions to the contrary.

¶ 22    At the hearing, Father contended that the Custody Order does not "direct a specific time for the facetime to occur[,]" only that Father ensure "availability for

fifteen minutes in the evening[.]" Father contends that the thirty minute window in which he claimed to have made the iPad available for FaceTime calls—from 6:00 p.m. to 6:30 p.m.—proved his compliance with the specific language of the Custody Order. Father is correct that the Custody Order did not specify an exact time for the contact, but it did provide for "*unrestricted but reasonable* telephone contact" and for the parties "to *make the* minor children *available* to the non-custodial parent for *phone or FaceTime* contact for fifteen minutes each evening." (Emphasis added.) Both parties understood the Custody Order and what was required to follow it in good faith. *See Middleton v. Middleton*, 159 N.C. App. 224, 226, 583 S.E.2d 48, 49 (2003).

¶ 23    The trial court's findings addressed the changes in Father's compliance with the Custody Order following his remarriage:

> [T]hree (3) days after getting remarried, [Father] emailed [Mother] informing her that he set up the minor children's iPad for FaceTime so that [Mother] could FaceTime the minor children directly, and that he would ensure that the iPad was turned on and charged. Prior to this, [Mother] sent and received FaceTime calls with the minor children through [Father]'s phone.
>
> 14. On April 29, 2018, [Father] blocked [Mother]'s phone number from his cell phone.

¶ 24    After blocking Mother's phone number from his phone, Father was repeatedly informed and was well-aware that Mother had not been able to contact the children, but he still refused to make the children available as required by the Custody Order.

Father argues that the trial court's other findings, such as Father blocking Mother's number from his phone, sending Mother a copy of his marriage license, and saving Mother's contact information in his phone as "psycho Bitch," are irrelevant to the question of whether he complied with the Custody Order. But these findings are relevant, as they demonstrate why Father suddenly began to block Mother's phone calls. This was not a random technological glitch or a few missed calls; Father's actions, as found by the trial court, demonstrate exactly *why* Father intentionally changed the method of communication, and thus show the willfulness of his actions.

Clearly, the trial court did not find Father's testimony that he was unaware of any problems regarding phone or FaceTime contact credible, as it included the following findings—unchallenged by Father—in the Contempt Order: "Father has continuously ignored [Mother]'s repeated requests to FaceTime the minor children during Father's custodial time, despite [Mother] informing Father that her calls to the minor children's iPad had gone [un]answered[;]" "[Mother] called the minor children's iPad at least sixty four (64) times, but none of her calls were answered. During this time, Father only allowed [Mother] FaceTime access to the minor children on three (3) occasions[;]" "[b]eginning . . . around September 2018, [Mother] could no longer FaceTime the minor children's iPad . . . because the children's iPad was either turned off, not connected to WiFi, or FaceTime was disabled[;]" "[f]rom May 2018 *through the hearing of this Motion*, [Mother] sent numerous text messages

and emails to Father asking to FaceTime the minor children. Father *did not respond to any of [Mother]'s FaceTime requests*[;]" "[Mother]'s counsel wrote Father's counsel on seven (7) occasions [between 25 June 2018 and 2 November 2018] regarding Father's refusal to allow [Mother] to FaceTime the minor children. Despite [Mother]'s counsel's efforts, *Father continued to deny [Mother] FaceTime access* to the minor children[;]" and "Father *arbitrarily chose* to turn the minor children's iPad on each evening from 6:00 p.m. to 6:30 p.m. *without informing [Mother]* that she should call during that thirty (30) minute time period." (Emphasis added.)

¶ 26    These and other findings demonstrate the trial court considered, but rejected, Father's testimony (1) that he was unaware of Mother's FaceTime concerns and difficulties, (2) that he did not believe Mother had tried to FaceTime the children in the time period between her filing of the Contempt Motion and the contempt hearing, and (3) that he had never "purposely denied facetime" or "phone contact" between the children and Mother. Concerning Father's testimony regarding "phone contact," the trial court also found as fact, unchallenged by Father: "On April 29, 2018, Father blocked Mother's phone number from his cell phone. As a result, email was Mother's only means of communication with Father" by which "she could request FaceTime calls with the minor children when her calls to the minor children's iPad went unanswered."

¶ 27    Father's argument relies upon the unsupported contention that he can engage

in conduct that contravenes the clear intention of the Custody Order, so long as the Custody Order did not specifically name the *precise means* by which Father was required to comply with its obvious purpose. However, as this Court has noted:

> Our Supreme Court, in determining whether a party was in contempt for violating a temporary restraining order, stated that "'[t]he order of the court must be obeyed implicitly, *according to its spirit and in good faith*.'" A party "'must do nothing, directly or indirectly, that will render the order ineffectual, either wholly or partially so.'"

*Middleton*, 159 N.C. App. at 226, 583 S.E.2d at 49 (emphasis added) (citations omitted). Implicit in every order is the understanding that its terms will be honored in good faith—that the parties bound by it will act under the dictates of common sense and reasonableness. *See, e.g., American Tel. & Tel. Co. v. Griffin*, 39 N.C. App. 721, 726, 251 S.E.2d 885, 888 (1979) (finding contempt where the contemnor's acts violated the "spirit" of the order).

¶ 28        Although the Custody Order did not set out the details of the "unrestricted Telephone Contact" between the parties and children, for about three and one-half years after the entry of the Custody Order, the parties had developed a method of communication and used it consistently until immediately after Father's remarriage—when he unilaterally changed how Mother could contact the children, and refused to respond to Mother's notifications that she was unable to do so.

¶ 29        We hold that the evidence supports all of the trial court's findings of fact,

including finding of fact 12, and the findings support the trial court's ultimate findings and conclusions that the Custody Order was still "valid and enforceable[,]" that the purposes "of the Custody Order may still be served by Father['s] compliance" with the "Unrestricted Telephone Contact" provision, that Father had "at all times, been fully aware of the Custody Order" and its requirements, that Father "has had the ability to comply with the Custody Order[,]" and, therefore, that "Father['s] failure to comply with the terms of the Custody Order as set forth [in the telephone and FaceTime provisions] is willful and constitutes a civil contempt of Court." This argument is without merit.

## D. Purge Conditions

¶ 30 Father argues that even if he was properly found to be in civil contempt, the purge conditions in the Contempt Order were "improper" and, therefore, "the [C]ontempt [O]rder should be vacated." We disagree.

¶ 31 The trial court's decree set out the purge conditions:

> 4. [Father] has the present ability to comply with the terms of the Custody Order. [Father] may purge himself of the contempt by unblocking Mother's number from his cell phone so that she can call or text Father to arrange a time for Mother to visit with the minor children via FaceTime; install FaceTime on the children's [iP]ad and ensure that it is functioning properly; ensure that the children's [iP]ad is charged and connected to Wifi so that Mother can FaceTime with the children on the [iP]ad; and, if the children's [iP]ad is not functioning, allow the children to FaceTime with Mother on Father's phone.

5. The [trial court] recognizes that the purpose of civil contempt is to obtain compliance with a court order and that the only sanction for civil contempt is imprisonment until a defendant complies with that order. The [trial court] also recognizes that [Father's] present ability to comply with the terms of the Custody Order requires that [he] be present in the home for a period of time to install FaceTime on the children's [iP]ad, ensure that it is functioning properly, and ensure that the children's [iP]ad is charged and connected to Wifi (or arrange for someone else to perform these tasks on his behalf), and that [Father] must have actual possession of his phone in order to unblock Mother's number and arrange a time for her to contact the children. The [trial court,] therefore, is postponing [Father's] report date to the Mecklenburg County Jail until April 12, 2019 in order to allow [Father] the opportunity to take the necessary steps to purge himself of the contempt and thus come into compliance with the terms of the Custody Order. Prior to [Father] being taken into custody, this [c]ourt shall hear briefly from the parties about the actions [he] has taken to purge himself of contempt. The [trial court] shall conduct a review hearing on April 10, 2019 from 12:00 to 12:15 p.m.

¶ 32        Father first contends that "[t]he purge conditions *do not set a date by which [Father] will have purged himself* of contempt and *so the contempt order should be vacated.*" (Emphasis added.) Father also contends that the purge conditions are improper because the order "sentences [Father] to jail without the appropriate findings that he has the ability to purge contempt and avoid incarceration." Father contends the improper purge conditions were the ones requiring him to "unblock[] Mother's number from his cell phone[,]" "install[] FaceTime on the children's [iP]ad[,]

and ensure that it is functioning properly."

"A contempt order 'must specify how the person may purge himself of the contempt.' N.C. Gen. Stat. § 5A–22(a)[.]" *Wellons v. White*, 229 N.C. App. 164, 181, 748 S.E.2d 709, 722 (2013). Citing *Wellons*, Father argues that "[t]he purge conditions must specify when compliance has purged the contempt—a party may not be held in contempt indefinitely." Father appears to interpret *Wellons* as containing a holding from this Court that if "the purge conditions . . . do not set a date by which [a contemnor] purge will be complete, the contempt order should be vacated." Father is incorrect. In *Wellons*, the trial court held: "[T]he district court erred by failing to provide [the contemnor] a method to purge his contempt." *Id.* at 182, 748 S.E.2d at 722. This Court then set forth the deficiencies of the contempt order:

> On 5 July 2012, the district court "declared [the contemnor] to be in direct and [willful] civil contempt of the prior Orders of the Court." It suspended [the contemnor]'s arrest based on the following condition: "[The contemnor] can purge his contempt by fully complying with the terms of the [30 March 2012] Interim Order, the prior Orders of 28 December 2007 and 27 July 2010. and this Order." The order did not establish a date after which [the contemnor]'s contempt was purged ***or provide any other means for [the contemnor] to purge the contempt***.

*Id.* (emphasis added). In *Wellons*, we simply held that the purge conditions in the contempt order "were 'impermissibly vague[,]'" *id.*, because they did not clearly inform the contemnor what actions he had to undertake to purge his contempt and

secure his release—therefore, it was possible the contemnor could be held indefinitely, with no meaningful way to purge his contempt. In *Wellons*, the trial court did not clearly state the purge conditions, it simply required the contemnor to comply with the prior court orders indefinitely—so in that case the contemnor would never be able to purge the contempt as long as the orders were in effect. *Id.*

¶ 34   In *Kolczak v Johnson*, 260 N.C. App. 208, 817 S.E.2d 861 (2018), this Court reversed a civil contempt order based upon the mother's violation of visitation provisions of a custody order. *Id.* at 220, 817 S.E.2d at 869. In *Kolcazk*, the order set forth several conditions for the mother's visitation, including not allowing the children to have any contact whatsoever with her new husband, who had been involved in and arrested for various crimes, or his criminal associates. *Id.* at 213, 817 S.E.2d at 865. The mother was also required to notify the father within 24 hours if she or her new husband were arrested again; he was arrested again, and the mother did not properly notify the father. *Id.* The trial court found that mother was in contempt of the order for her failure to notify the father of an arrest and allowing her husband to be present at her residence when the children were there, as well as registering the children in a summer camp without consulting the father in violation of first-refusal provisions. *Id.* The contemptuous actions all arose from visitation provisions of the custody order, and all were discrete incidents which had occurred in the past. *Id.* Although the trial court held the mother in civil contempt, the order

did not include *any* purge condition. *Id.*

¶ 35        In *Kolczak*, this Court discussed the difficulty of creating an appropriate purge condition in this situation:

> [I]n this case, the contempt is primarily based upon communication and visitation provisions of the orders, not child support. It is not apparent from the order how an appropriate civil contempt purge condition could "coerce the defendant to comply with a court order" as opposed to punishing her for a past violation. *Wellons v. White*, 229 N.C. App. 164, 181, 748 S.E.2d 709, 722 (2013). And here the trial court did not order vague purge conditions; it ordered none at all.
>
> We believe this case is more similar to *Wellons* than *Lueallen*. *Compare Lueallen*, 790 S.E.2d 690; *Wellons*, 229 N.C. App. 164, 748 S.E.2d 709. In *Wellons*, the Court addressed a father's denial of the grandparent's visitation privileges established by a prior order. *See Wellons*, 229 N.C. App. at 165, 748 S.E.2d at 711. In *Wellons*, the trial court held the father in civil contempt for denial of visitation and ordered that he comply with the terms of the prior orders as a purge condition, but this Court reversed the contempt order[.]
>
> . . . .
>
> We have previously reversed similar contempt orders. For instance, in *Cox* a contempt order stated the defendant could purge her contempt by not:
>
>> placing either of the minor children in a stressful situation or a situation detrimental to their welfare. Specifically, the defendant is ordered not to punish either of the minor children in any manner that is stressful, abusive, or detrimental to that child.
>
> There, we reversed because the trial court failed to clearly

> specify what the defendant can and cannot do to the minor
> children in order to purge herself of the civil contempt.
>
> Similarly, in *Scott* a contempt order stated: Defendant may
> postpone his imprisonment indefinitely by (1) enrolling in
> a Controlled Anger Program approved by this Court on or
> before August 1, 2001 and thereafter successfully
> completing the Program; (2) by not interfering with the
> Plaintiff's custody of the minor children and (3) by not
> threatening, abusing, harassing or interfering with the
> Plaintiff or the Plaintiff's custody of the minor children.
>
> There, although we indicated the requirement to attend a
> Controlled Anger Program may comport with the ability of
> civil [violators] to purge themselves, we reversed because
> the other two requirements were impermissibly vague.
>
> In the case at hand, the district court did not clearly specify
> what Mr. White can and cannot do to purge himself of
> contempt. Although the district court referenced previous
> orders containing specific provisions, it did not: (i) establish
> when Mr. White's compliance purged his contempt; or (ii)
> provide any other method for Mr. White to purge his
> contempt. We will not allow the district court to hold Mr.
> White indefinitely in contempt. Consequently, we reverse
> the portion of the 5 July 2012 order holding Mr. White in
> civil contempt.

*Id.* at 219–20, 817 S.E.2d at 868–69. Unlike *Kolczak* or *Wellons*, here the trial court

did "clearly specify what [Father could] do to purge himself of contempt." *Id.*

¶ 36        In the order on appeal, the trial court acknowledged the difficulty in

constructing a purge condition in a contempt order for a refusal to comply with an

order regarding visitation, which is always an ongoing obligation. Unlike *Kolzcak*,

*id.*, here the trial court's order clearly sets forth exactly what Father needed to do to

purge himself of contempt: he had to set up FaceTime on the children's iPad to allow Mother the communication with the children set out in the Custody Order. Since he could not personally accomplish this task while in jail, the trial court allowed him time to take the specific steps set out in the order. In this type of situation, the trial court must tailor the purge conditions to the needs of the particular case

¶ 37 Here, the trial court postponed Father's time to report to the jail to April 12, 2019 to allow time for him to take "the necessary steps to purge himself of the contempt and thus come into compliance with the terms of the Custody Order." The trial court also set a time for a "review hearing" on April 10 to "hear briefly from the parties about the actions Father] has taken to purge himself of contempt."[2]

¶ 38 Father argues the trial court's order is internally contradictory because the order acknowledges that "if Father is in jail he cannot purge by complying" and to remedy the "apparent contradiction, the trial court 'delays' the report to jail date to allow him time to comply." But if Father had not complied with the purge condition by April 10, at the review hearing, Father would then go to jail and would have no ability to purge the contempt.

¶ 39 Although the trial court did allow Father the time to purge himself of contempt

---

[2] The trial court rendered its order at the close of the hearing on 12 February 2019. In open court, the trial court informed the parties of the purge conditions and that Father would have "two months" to take the actions needed "to make it possible that [Mother] has contact with" the children. The written and signed Contempt Order was filed on 2 April 2019.

by setting up the children's iPad properly and thus avoid reporting to jail, the trial

court's order is not internally contradictory. In fact, the trial court set out exactly

what Father would need to do to purge the contempt and allowed him time to take

these actions personally, but the order also noted that Father could "arrange for

someone else to perform these tasks on his behalf." In this manner, the trial court's

purge provisions are similar to those often imposed in civil contempt orders for

nonpayment of child support. A contemnor may be held in civil contempt and

imprisoned immediately, with a purge condition of payment of a sum of money. Once

the contemnor is in jail, he must arrange for payment of the amount set as the purge

condition to purge the contempt and be released from jail. If the contemnor has

sufficient cash in his physical possession to pay the purge payment immediately, he

can immediately purge the contempt and not be imprisoned. But if the contemnor

does not have sufficient cash in his physical possession to pay the purge payment and

the contempt order directs that he be immediately taken into custody, he will be

imprisoned and, in jail, he does not have the ability to personally go to get the funds

to pay the purge payment—even if he has those funds readily available at home or in

a bank account. But from jail, he can contact another person—a friend, a family

member, his banker, or his attorney—to arrange for someone else to retrieve his

funds and make the purge payment. In this respect, the trial court's purge conditions

here are quite similar to those commonly imposed in cases where a financial purge

payment is ordered—though, unlike payment of past due child support, there is no way to quantify a loss of past visitation and no way to replace the missed communications between a parent and her children. The trial court noted this problem:

> The Court recognizes that the purpose of civil contempt is to obtain compliance with a court order and that the only sanction for civil contempt is imprisonment until a defendant complies with that order. The Court also recognizes that [Father's] present ability to comply with the terms of the Custody Order requires that [Father] be present in the home for a period of time to install FaceTime on the children's iPad, ensure that it is functioning properly, and ensure that the children's iPad is charged and connected to Wi-Fi (or arrange for someone else to perform these tasks on his behalf), and that [Father] must have actual possession of his phone in order to unblock Mother's number and arrange a time for her to contact the children.

The trial court gave Father time to set up the children's iPad properly before reporting to jail, and if he took the actions directed by the order, he would not have to report to jail. If he failed to take these actions personally and was imprisoned, he could still "arrange for someone else to perform these tasks on his behalf." Either way, Father had the "present ability" to comply with the Custody Order and with the purge conditions in the Contempt Order. Thus, the order is not internally contradictory.

Father also argues that although paragraphs 5 "seems to say that April 10 is

the day upon which purge is complete," "paragraph 4 talks about an ongoing obligation. Essentially, paragraph 4 tells him to come into compliance and stay in compliance with the terms of the custody order." In this regard, Father argues this order is like the order in *Wellons* and is thus improper. *See Wellons*, 229 N.C. App. at 182, 748 S.E.2d at 722. But we do not read the Contempt Order as requiring indefinite compliance with the Custody Order as a purge condition. Paragraph 4 simply sets out the specific conditions which would need to exist to allow the communications between Mother and the children as directed by the Custody Order, while paragraph 5 sets out the specific time for the review hearing, based upon the trial court's decision *to give Father the opportunity* to return to his home and set up the iPad personally. Apparently, Father did not appreciate the trial court extending him this opportunity and would have preferred immediate imprisonment, so he could then write a letter or make a phone call from jail to "arrange for someone else to perform these tasks on his behalf." But the trial court was within its discretion to give Father this opportunity to purge his contempt before having to report to jail.

### E. Amending the Custody Order

¶ 42        Father's last argument is that the "purge conditions improperly modify the parties' custody order." He contends:

> In setting its purge conditions, the trial court required [Father] to unblock [Mother] from his phone. The court also required [Father] to arrange [Mother]'s FaceTime

> windows with [Mother]. The parties' custody order does require some communication (e.g. consultation on legal custody issues, notification of certain things), but the order does not require that the parties communicate by telephone. The order also does not provide that the parties must consult to determine when [Mother] can FaceTime the children. By requiring [Father] to unblock [Mother] from his phone and to engage in regular (daily?) communication with [Mother] to arrange each FaceTime event, the trial court improperly modified the parties' custody order, and those provisions of the order should be vacated.

¶ 43 Father is correct that the Custody Order did not set out exact times and methods for the "Unrestricted Telephone Communication" between the parties and children, but it did provide that "[e]ach party shall generally have unrestricted but reasonable telephone contact with the minor children. The parties agree to make the minor children available to the non-custodial parent for phone or FaceTime contact for fifteen minutes each evening." The purge conditions in the Contempt Order do not change this provision of the Custody Order but only set out the actions Father must take to purge the contempt by setting up the iPad in a manner to allow the reasonable contact directed by the Custody Order.

¶ 44 The purge provisions here are comparable to those in *Wilson v. Guinyard*, 254 N.C. App. 229, 801 S.E.2d 700 (2017). In *Wilson*, the mother lived in North Carolina and the father in South Carolina. *Id.* at 230, 801 S.E.2d at 702. The custody order provided for the parties to meet at "South of the Border Amusement Park" to

exchange the child for visitation. *Id.* The order also set out times for the exchanges but required each party to notify the other of delays in travel "due to unforeseen circumstances." *Id.* The mother filed a motion for contempt alleging the father was "habitually late" without valid reasons and on at least one instance the child missed a day of school after the father had missed a scheduled exchange. *Id.* at 231, 801 S.E.2d at 702. At the hearing, she presented evidence the father was late to over forty exchanges, sometimes up to two hours late. *Id.* at 231, 801 S.E.2d at 702–03. The trial court held the father in civil contempt and set as purge conditions that the "[d]efendant could purge himself of contempt by both picking up and dropping off their son in Durham for the next three weekend visits. The Court further provided that if the defendant was more than thirty minutes late to either pick up or drop off [the child], a weekend visitation would be forfeited." *Id.* at 238, 801 S.E.2d at 706.

¶ 45     This Court held the purge conditions requiring the father to exchange the child at a different location than established by the custody order for "the next three weekend visits" and for forfeiture of a visit for being more than 30 minutes late was not a modification of the custody order:

> These provisions do not constitute a modification of custody. *See Tankala v. Pithavadian*, __ N.C. App. __, __, 789 S.E.2d 31, 33 (2016) (holding a trial court's order providing additional dates and locations for custodial visitation not inconsistent with the governing child custody order is not a modification of the terms of custody).

> Permanent joint legal custody and secondary physical custody remained with Defendant both before and after the contempt order. These provisions more specifically identify what Defendant can and cannot do regarding the visitation times in order to purge himself of the civil contempt and insure [sic] Defendant's compliance with the previous court orders. *See Cox*, 133 N.C. App. at 226, 515 S.E.2d at 65; *Scott*, 157 N.C. App. at 394, 579 S.E.2d at 439. The trial court did not improperly modify custody or impose improper purge conditions.

*Id.*

As in *Wilson*, the trial court's purge conditions set out requirements for Father to purge the civil contempt and the conditions are consistent with the Custody Order. *Id.* The purge provisions of the Contempt Order apply only until Father has taken the actions required to purge the contempt. The Contempt Order does not modify the Custody Order. This argument is without merit.

## IV. Conclusion

The trial court acted reasonably and within its discretion. "The [Contempt O]rder provides flexibility for unusual circumstances . . . , which [Father] clearly and repeatedly abused." *Wilson*, 254 N.C. App. at 237, 801 S.E.2d at 706. For the reasons discussed above, we affirm.

AFFIRMED.

Judge TYSON and COLLINS concur.